**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

---

CLEVELAND BAKERS AND TEAMSTERS HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated,

Plaintiff,

v.

OHIOHEALTH CORPORATION,

Defendant.

---

# CLASS ACTION COMPLAINT

---

Plaintiff Cleveland Bakers and Teamsters Health and Welfare Fund, individually and on behalf of all others similarly situated, bring this civil antitrust action against OhioHealth Corporation ("Defendant" or "OhioHealth"). This action seeks damages and an injunction forbidding OhioHealth from using unlawful contract restrictions that prevent Ohio employers and unions from accessing budget-conscious insurance networks and lower priced healthcare. These unlawful restrictions restrain trade, reduce competition, increase prices, and harm Ohio employers, unions, insurers, and consumers. OhioHealth's conduct resulted in an investigation and civil action by the U.S. Department of Justice and Ohio Attorney General in this District, No. 2:26-cv-207-ALM-SCS, after which OhioHealth has agreed to remove some of the restrictions in a process overseen by this Court.

## I. NATURE OF THE ACTION

1. This is an action for restraint of trade, unlawful monopolization, and unfair methods of competition seeking class-wide damages and injunctive and equitable relief under

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, Ohio's Valentine Act, Ohio Rev. Code Ann. § 1331.01 *et seq.*, and Ohio's common law.

2. OhioHealth is the dominant hospital system in Central Ohio and at least some of its facilities and providers are necessary to include in insurance provider networks. It has used that power to impose contractual restraints that impede the introduction of budget-conscious plans that would disfavor its expensive facilities and providers.

3. These restraints inhibit the normal forms of price competition between hospital systems and other providers: OhioHealth blocks insurance networks from directing more patient volume to lower-cost providers through network design, steering programs, and other incentives for patients. The restraints allow OhioHealth to charge supracompetitive prices without worrying about a loss of patient volume.

4. OhioHealth's prices reflect that destruction of competition: Its inpatient prices are 20-30% higher than its primary competitors that offer similar or better quality care. Its outpatient prices are 30% higher than similar or better quality competitors. OhioHealth's prices for outpatient services are consistently among the highest anywhere in Ohio. For specific easily-comparable procedures, the overcharges are even more stark: Its prices for giving birth are about 80% higher than those of its primary competitor and its prices for routine testing are over three times higher than those of its primary competitor.

5. OhioHealth uses its profits from anticompetitive activities to pay its executives compensation that is unreasonably high and far out of line with standard industry practice. In 2024, OhioHealth's CEO was paid over $11 million. Many of the system's other executives and employees are paid over $1 million per year.

6. OhioHealth's contractual restraints, which the system is able to impose only by virtue of its market power and which interfere with the competitive process, have caused substantial anticompetitive effects in the form of higher prices, reduced quality, and reduced consumer choice. The restraints' success in enriching OhioHealth at the expense of unions, employers, local governments, and patients, violates the Sherman Act and the Valentine Act, Ohio's antitrust statute, and also constitutes unjust enrichment. Plaintiff brings this action, on behalf of itself and others similarly situated, to seek damages to compensate the victims of OhioHealth's unlawful scheme.

## II. PARTIES

### A. Plaintiff

7. Plaintiff Cleveland Bakers and Teamsters Health and Welfare Fund ("CB&T Fund" or "Plaintiff") is a self-funded union health plan that provides health benefits to about 10,000 individuals across Ohio, including those living, working, or visiting the Relevant Markets.

8. Like other health plans in Ohio, CB&T Fund has struggled with the rising cost of health care and the rising prices charged by OhioHealth. CB&T Fund has paid about $1.2 million in the past four years to OhioHealth across all the Relevant Markets at prices that were inflated by the conduct outlined below. CB&T Fund has also paid other non-OhioHealth providers in the Relevant Markets whose prices have been inflated due to the umbrella effects of OhioHealth's conduct, as outlined below. OhioHealth is included in CB&T Fund's network, which was subject to the restraints outlined below for longer than the past four years. CB&T Fund directly pays the prices OhioHealth imposed on the provider network used by CB&T Fund.

9. Self-funded payors like CB&T Fund pay providers for healthcare services delivered to their members. They do not pay an intermediary who re-sells those services. Their

third-party administrator ("TPA") performs solely administrative tasks: adjudicating claims, calculating patient responsibilities and allowed amounts, and arranging the transfer of CB&T Fund's funds to healthcare providers, including OhioHealth. Specifically, as to payments, the TPA causes payments to OhioHealth to be made from a bank account belonging to CB&T Fund and containing CB&T Fund's money. CB&T Fund retains financial risk for its health benefit plan.

10. CB&T Fund's TPA contract expressly states that the TPA acts "as agent for" the CB&T Fund when it causes payments to be made to OhioHealth from CB&T Fund's bank account.

11. Because CB&T Fund does not buy from an intermediary who is reselling the services, it is a direct purchaser of healthcare services from OhioHealth.

12. OhioHealth's anticompetitive contract terms suppressed competition and inflated and maintained at supracompetitive levels the prices paid by CB&T Fund. A clear, direct causal link exists between the alleged violation and the alleged harm.

13. The nature of CB&T Fund's injury is the classic antitrust injury: it alleges overcharge damages caused by a violation of the antitrust laws. The injury is direct. Only CB&T Fund suffered it. Its TPA did not suffer any damages as a result of inflated charges for services delivered to CB&T Fund's members. The TPA did not suffer harm and then pass on that harm to CB&T Fund, because the TPA has no financial responsibility or liability for charges for CB&T Fund's members. CB&T Fund and members of the Class bear all financial risk related to healthcare services that OhioHealth provides. Thus, only CB&T Fund was injured by overcharges on services delivered to its members.

14. CB&T Fund's damages are not speculative. Overcharge damages in healthcare cases are routinely proven via insurer claims data.

15. There is no danger of duplicative recoveries or complex apportionment, because no other entity suffered damages as a result of the payments made by CB&T Fund. To the extent any of CB&T Fund's members had responsibility for OhioHealth's charges because of a deductible or co-insurance, those amounts are not at issue in this case and can be identified and excluded based on claims data maintained in the ordinary course of business by CB&T Fund and its TPA.

**B. Defendant**

16. Defendant OhioHealth is a nominally not-for-profit corporation based in Columbus, Ohio and is the dominant hospital system in Central Ohio. OhioHealth owns or manages 16 inpatient hospitals, numerous outpatient facilities, and ambulatory surgery centers.

**III. JURISDICTION AND VENUE**

17. This Court has personal jurisdiction over OhioHealth because it is a resident of Ohio and because the anticompetitive conduct at issue took place primarily in Ohio.

18. This Court has subject matter jurisdiction over Plaintiff's federal claims under 15 U.S.C. § 15 and 28 U.S.C. § 1331. The Court has jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, because they arise out of the same transactions and occurrences.

19. Venue is appropriate in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 15, because OhioHealth is domiciled in this judicial district, and/or because a substantial part of the events or omissions giving rise to this action occurred in this judicial district. This Court is the venue for a related action brought by the U.S. Department of Justice and Ohio Attorney General against OhioHealth for similar conduct that is currently before The Honorable Algenon L. Marbley. *See* No. 2:26-cv-207-ALM-SCS.

20. OhioHealth engages in interstate commerce and in activities substantially affecting interstate commerce. OhioHealth provides healthcare services for which employers, insurers, and individual patients remit payments across state lines and sees some patients from outside of Ohio. OhioHealth also purchases supplies and equipment which are shipped across state lines and otherwise participates in interstate commerce.

## IV. OVERVIEW OF HOSPITAL/INSURANCE MARKETS AND CONSOLIDATION

### A. Hospital/Insurance Negotiations Within a Functioning Market

21. The market for hospital services is different from other product/services markets because the person consuming the hospital services (the patient) does not negotiate—and in many cases, does not even know beforehand—the price of the services they are consuming. Nor does the patient typically pay the vast majority of the costs of the medical services they consume. Instead, for insured individuals, those costs are paid primarily by their health insurance plan.

22. Many businesses, unions, and local governments offer health plans to their employees. In general, there are two different models for such plans: "fully insured" and "self-funded" health plans.

23. In a "fully insured" health plan, the employer and its employees pay premiums to an insurance company which, in turn, bears insurance risk and pays the bills from hospitals and other providers. Employees often pay a portion of the premium out of their paychecks, along with out-of-pocket costs in the form of deductibles, co-pays, and/or coinsurance. For fully insured health plans, then, the insurer bears the financial risk relating to employees' care and pays the hospital for that care.

24. For a "self-funded" health plan, by contrast, the employer bears the insurance risk and directly pays the vast majority of the healthcare expenses their employees (and their employees' dependents) incur, with employees typically sharing in some of the costs through

premiums, co-pays, and co-insurance. Employers and organizations that are self-funded typically rely on third-party administrators ("TPAs") to process claims and otherwise manage the day-to-day affairs of the self-funded health plan. A TPA provides administrative services to a self-funded plan, including payment processing, but does not buy or sell medical services and is not responsible for any of the plan's expenses or actuarial risks, which are borne exclusively by the self-funded payor (*i.e.*, the employer) and its members.[1]

25. For both fully insured and self-funded health plans, insurers build healthcare "provider networks," which consist of the providers with whom an insurer has a contract to provide services to the members of health plans (both self-funded or fully-insured) at rates the insurer negotiates with providers. This leads to the commonly used term of a provider being "in-network" for a health plan. In-network rates (also known as "allowed amounts") are prices negotiated between insurers and providers for each type of service provided by healthcare facilities and healthcare professionals. Members typically receive more generous coverage from their health plan when they visit an in-network provider, which incentivizes them to do so. Going to an "out of network" provider, in contrast, generally means higher costs and more uncertainty for both the member (in terms of out-of-pocket costs, frequent surprise bills, and paperwork burden) and their health plan (in terms of higher prices than those offered to plans that include the provider in-network and significant administrative burden).

26. For both practical reasons and because of contractual restrictions, self-funded payors do not assemble their own provider networks. It would be practically impossible for every employer, union, and local government to conduct individual negotiations with the many

[1] As major TPA and Network Vendor Aetna explained in a recent court filing: self-funded plans "Aetna primarily serves as a third-party administrator ("TPA") for commercial clients, who typically self-insure their health plans and directly bear the cost of higher hospital prices. As a TPA, Aetna negotiates a variety of network design options from which employers choose, but Aetna does not insure the plans."

providers where employees and dependents might receive care. Providers would also refuse to negotiate thousands of separate contracts with individual self-funded payors.

27. Accordingly, insurers allow self-funded payors to "rent" or access their networks. In this role, insurers are sometimes referred to as "Network Vendors," indicating that they assemble provider networks—*i.e.*, they negotiate with hospital systems for inclusion in a network and negotiate the price the hospital will charge for each procedure in a given network—and Network Vendors then rent these networks to self-funded payors, while not acting as an insurer for those payors. Some companies operate only as Network Vendors, without operating any of their own fully-insured plans. Either way, Network Vendors negotiate with providers on price, attempting to balance the need to build networks with an adequate number of providers and the need to build networks that offer reasonable prices. The prices negotiated between Network Vendors and providers for in-network care are known as "allowed amounts," which generally represents the prices the self-funded payor will pay the provider for that care. In this way, the insurer negotiates with the hospital the price that the self-funded payor will pay for its members' care, and the self-funded payor is obligated to pay that price to the provider. In the healthcare market, it is common to calculate and negotiate prices as a "percentage above Medicare" since Medicare sets prices for providers that consider a variety of local cost factors while providing for a reasonable profit margin.[2]

28. For a Network Vendor's network to be commercially viable (*e.g.*, for it to be one an employer or union would choose to offer its employees or members), it must include enough providers across the full spectrum of healthcare services patients may need or want, from primary care to complicated inpatient hospital surgical care to specialty practices. And because

[2] *See, e.g.,* Dr. Ashish Jha's conclusion: "Medicare rates were designed to sustain access and should be enough for a large number of providers to survive" Hospital bills are too high. Price caps are the answer., Ashish Jha, Boston Globe, Mar 9, 2026, https://www.bostonglobe.com/2026/03/09/opinion/hospital-price-caps-ashish-jha/

members generally insist on receiving their healthcare near where they live or work, a plan will not be viable if the provider network does not include a sufficient number of providers in these locations. The network must also include any providers and facilities that payors and a significant number of their members desire to be able to access at in-network rates.

29. Network Vendors tend to be large, well-known insurance companies like Anthem BCBS Ohio, United HealthCare, and Cigna that have the scale and technical knowledge to build networks. In some cases, the Network Vendor also serves as the TPA to the same self-funded payor. A self-funded payor can therefore contract with an insurance company like Anthem BCBS both for use of its network and to administer the plan. Thus, the typical self-funded payor pays for in-network services at the prices negotiated by the Network Vendor, pays the Network Vendor for access to the network, and pays the TPA a fee for administering the plan.

30. Network Vendors often use the same provider networks for the insurance products they offer to fully-insured employers. These plans operate in a similar way to self-funded employer plans: the prices are determined by the Network Vendors' negotiations with providers and the plans are subject to the same restraints described below. In the case of fully-insured plans, the insurers pay the provider for the claims for services rendered.

31. Network Vendors generally do not engage in a separate negotiation for each covered medical service. Rather, Network Vendors generally engage in a single negotiation for clusters of services that will be available to payors that use the network. If a Network Vendor and a hospital reach a deal for a cluster of services (for instance, all acute inpatient hospital services at a given facility), the hospital will generally be considered in-network for every service in that cluster. This means that for any service in that cluster, if a payor's member receives that service from that hospital, the patient will pay the required out-of-pocket costs set

forth in their health plan documents and the payor will pay the hospital the remaining portion of the allowed amount the Network Vendor negotiated.

32. In competitive markets—markets in which there is free competition among a number of hospitals or other facilities for inclusion in health insurance products offered to payors and their members—a Network Vendor will contract with a hospital or other facility for a bundle of services only when the hospital offers services that are competitively priced and of sufficiently high quality. Network Vendors may, and in competitive markets often do, decline to include in their networks any services from a hospital or other facility if that hospital or facility's prices or quality of care are not competitive with other nearby providers. Similarly, a Network Vendor may include as in-network only some clusters of services at any given hospital or hospital system. For instance, the Network Vendor may include one hospital in-network for all acute inpatient hospital services but may choose not to include that hospital in-network for outpatient services (visits not requiring an overnight stay) because the Network Vendor has identified ways for plans to purchase higher quality care and/or less expensive versions of those outpatient services from a nearby competing hospital or another outpatient provider.

33. In competitive markets, these dynamics spur price and quality competition among providers. Hospitals negotiating contracts with Network Vendors know that if their prices are too high or their quality of care too low, the Network Vendors will decline to contract with them and will instead contract with other, higher-value providers. Providers generally do not want to be excluded from insurance networks because patients are much less likely to obtain medical services from an out-of-network provider, and collecting revenue for out-of-network care is slower, more expensive, and more uncertain, so exclusion from networks deprives the provider of patient volume and revenue. The threat of exclusion thus places downward pressure on prices.

34. Beyond removing high-cost providers from their networks, Network Vendors and payors can secure low prices from hospitals and other providers through various budget-conscious plan designs or the threat of implementing such designs. For example, Network Vendors and payors may, for a variety of reasons, include both higher-cost and lower-cost providers within the same network but incentivize (or "steer") their members to obtain care from one of the lower-cost providers that offers the same or better quality of care. For example, payors might charge their members lower co-pays or lower co-insurance percentages if they use lower-cost providers.

35. The threat of steering creates similar incentives as the threat of exclusion. If providers know that they *could* lose patient volume because their prices are too high, they are less likely to demand unjustifiably high prices. The possibility of steering, therefore, enhances price competition even within networks that do not ultimately include steering.

36. One form of steering, called "tiering," involves the creation of "tiered" networks or "tiered" plans, in which low-cost, high-quality providers are placed in a higher "tier" than more expensive and/or lower-quality competitors, and the plan's members are then incentivized (*e.g.*, through lower out-of-pocket costs, such as more generous co-insurance coverage) to choose providers in a higher tier. The creation of "Centers of Excellence" is a form of tiering that identifies the best value providers for certain sets of services (*e.g.,* orthopedic surgery) within a network and provides incentives for patients to seek care there.

37. Another budget-conscious plan design involves the use of "narrow networks" or "high-performance networks," which consist of a smaller set of healthcare providers than is conventional, and typically exclude the most expensive providers. Because providers included in these networks are likely to receive a higher volume of patients that are enrolled in those

networks (because there are fewer competing providers in the network), providers generally are willing to accept far lower fee-for-service prices for inclusion in narrow networks. Payors that offer health benefits to their members may offer their members a choice between a broad-network plan and a narrow-network plan, with members who choose the narrow-network plan rewarded with lower premiums and lower out-of-pocket expenses than those who choose the broad-network plan. By offering narrow-network plans, payors can achieve lower costs when at least some members choose a lower-cost narrow-network plan and, at the same time, incentivize providers to lower their prices so that they will be included within both the broad and narrow networks. Payors' ability to offer to their members both a broad-network option and a narrow-network option allows them to reduce costs while still meeting the needs of members who want or need wider access. This creates downward pressure on providers' prices more generally, thus lowering overall spending on hospital care even for payors that choose not to offer such narrow-network options to their members. The availability of narrow-network options enhances price competition between providers, thereby lowering the prices providers charge across the board.[3]

38. "Site of service" steering is a plan feature that saves payors and patients money by incentivizing patients to have procedures done in a lower-cost location (site of service)—such as an ambulatory surgery center—instead of a higher-cost site of service, such as a hospital.

[3] *See, e.g.*, Matthew Rae et al., "How Narrow or Broad Are ACA Marketplace Physician Networks?," KFF, August 26, 2024, https://www.kff.org/private-insurance/report/how-narrow-or-broad-are-aca-marketplace-physician-networks/ ("How Narrow or Broad Are ACA Marketplace Physician Networks?") ("Providers agree to lower fees and other terms with insurers in order to be included in one or more of the networks they offer. […] While other factors also contribute to plan premiums, including the breadth of hospital networks and the plan design, narrow physician networks were associated with meaningfully lower total costs."); Leemore S. Dafny et al., "Narrow Networks on the Health Insurance Marketplaces: Prevalence, Pricing, and the Cost of Network Breadth," Health Affairs, Vol. 36, No. 9, 2017, pp. 1606–1614, p. 1607 ("[N]arrow-network plans may be able to negotiate lower prices from providers in return for steering greater patient volume to them, and plans could then pass these savings on to consumers in the form of lower premiums. […] The McKinsey Center reported that among silver plans on the Marketplaces in 2014, plans with narrow hospital networks were priced 16 percent below similar plans with broad hospital networks, and this discount had risen to 22 percent by 2016.")

39. Because these plan design tools allow members to save money by choosing cost-effective hospitals and other providers while still obtaining high-quality care, they create price and quality competition among providers. Academic research by health economists has demonstrated that when payors and Network Vendors are free to engage in steering and budget-conscious plan designs, payors pay significantly lower costs for healthcare, with no corresponding reduction in health outcomes. Peer-reviewed research studies find that steering reduces health care costs by significant amounts and is especially important in markets where health insurance dampens the incentives of patients to consider price.[4]

40. Budget-conscious plan design not only helps payors save money on any particular patient; it also encourages higher-priced providers to lower their prices so that payors steer toward them, or at least do not steer away from them. Budget-conscious plan designs, including steering, tiering, and narrow networks, are thus important tools that Network Vendors and payors can use to exert downward price pressure on hospitals and providers. For example, a Network Vendor could secure lower prices from a hospital or other provider by agreeing to place that hospital or provider in the most-preferred tier of its tiered network or to include it in both its narrow-network and broad-network plans.

41. OhioHealth impedes this normal competition by restricting payors from offering budget-conscious plans that would cause OhioHealth to lower its prices to competitive levels.

**B. Economic and Policy Consensus That OhioHealth's Conduct Raises Prices**

42. The unique mechanics of the healthcare market provide an opportunity for hospital systems with market power to anticompetitively restrain trade through unduly restrictive

[4] *See, e.g.*, the conclusion of Dr. Laurence Baker: "Because insurance dampens the value of search in health care markets, policies such as the use of reference pricing types of cost sharing, in which patients pay more out of pocket for more expensive providers of similar services, could be beneficial." Private Insurers' Payments For Routine Physician Office Visits Vary Substantially Across The United States, Laurence Baker, M. Kate Bundorf, and Anne Royalty, Health Affairs, 2013 32:9, 1583-1590 10.1377/hlthaff.2013.0309

negotiations and agreements with payors to extract supracompetitive prices. Supracompetitive prices are rates that are higher than would result from an unfettered competitive process. In the market for hospital services, supracompetitive prices come in the form of inflated allowed amounts, which are the rates negotiated by Network Vendors and paid by payors.[5]

43. One form of anticompetitive behavior that hospital systems with market power may engage in is the imposition of "anti-incentive" or "anti-steering" provisions on Network Vendors and payors. These measures can take many forms, such as preventing Network Vendors and payors from favoring other providers through financial incentives or other inducements, preventing Network Vendors and payors from placing any other provider in a higher tier than the hospital system with market power, preventing Network Vendors and payors from creating narrow networks that exclude the hospital system with market power, or requiring Network Vendors to make punitive financial payments if Network Vendors' steering policies result in 'material' financial impact to the hospital. These anti-steering measures effectively prevent budget-conscious plan designs, and essentially require Network Vendors and payors to grant the hospital system a "most favored nation" status. As detailed below, OhioHealth forces anti-steering restraints on all or nearly all Network Vendors used by payors, including Plaintiff.

44. There is a widespread, bipartisan consensus that anti-steering restrictions like these harm competition and result in higher prices for insurers, employers, unions, and consumers.

[5] Even paid consultants for the hospital industry acknowledge that the larger a healthcare provider group becomes, the more it has the ability to raise prices to supracompetitive levels. See, e.g., Dr. Laurence Baker and Daniel Austin's conclusion: "More concentration among physician practices, which implies less competition, is associated with higher prices paid by private PPOs to physicians for most of the fifteen common and costly procedures we examined. The price variations we observed were statistically, as well as financially, significant." Less Physician Practice Competition Is Associated With Higher Prices Paid For Common Procedures, Daniel R. Austin and Laurence C. Baker, Health Affairs, 2015 34:10, 1753-1760 10.1377/hlthaff.2015.0412

45. In 2016, former President Obama's Department of Justice brought a Sherman Act suit against Atrium Health, a North Carolina hospital system that imposed anti-steering and anti-tiering provisions on payors in the Charlotte area. In the lawsuit, the government alleged that the system "prevent[ed] insurers from offering tiered networks that feature hospitals that compete with [the system] in the top tiers, and prevent[ed] insurers from offering narrow networks that include only [the system's] competitors." The government further alleged that these and other "steering restrictions reduce competition resulting in harm to Charlotte area consumers, employers, and insurers." After a federal court held that the system's use of anti-steering provisions was plausibly anticompetitive under the Sherman Act, the case settled, and the system agreed not to impose anti-steering and anti-tiering provisions on payors going forward.

46. In 2018, President Trump's Assistant Attorney General for Antitrust also criticized anti-steering provisions, saying, "Without these provisions, insurers could promote competition by 'steering' patients to medical providers that offer lower priced, but comparable or higher-quality services. Importantly, that practice benefits consumers, but the anti-steering restrictions prevented it."

47. Former President Biden's Secretary of Health and Human Services, Xavier Becerra, wrote in his previous role as California Attorney General that contracting practices that "prevented insurers from using steering and tiering" were among types of "anticompetitive conduct" that "discouraged competition, impaired price-conscious consumer choice, and resulted in inflated prices on a system-wide basis that exceed its competitors and exceed the prices its hospitals and its other providers could charge in a free, competitive market."

48. Because of the nature of the healthcare market, in which the people using services (patients in consultation with their providers) are not the same as the entities primarily paying for services (self-funded health plans and commercial insurers), there is a consensus in healthcare policy and economics that anticompetitive restraints imposed on payors by hospital systems with market power block rival providers from competing on cost and quality of care; constrain the choices of consumers and health plans by limiting the availability of pricing and quality of care information; remove incentives for new providers to enter the market; bar Network Vendors and payors from developing budget-conscious network options to compete with their rivals; and have other anticompetitive harms detailed below. And because of the nature of the healthcare market outlined previously, these harms to competition take place even if, on paper, consumers still have "choices" among providers. Thus, they foreclose key methods of competition that Network Vendors and payors would normally use to encourage price and quality of care competition between providers.

49. A 2020 Research Report on "Preventing Anticompetitive Contracting Practices in Healthcare Markets" by the Petris Center and UC-Hastings College of Law describes how "Health systems with market power can…use anti-incentive clauses, also known as anti-steering and anti-tiering clauses, to hinder competition on price and quality."

50. A May 2022 academic study in *Health Affairs* concluded that tools like steering, tiering, and transparency in pricing are particularly important to preserve competition after consolidation like the type OhioHealth has engaged in: "In addition to proactive oversight of mergers, acquisitions, and joint contracting, the actions of policy makers, insurers, and employers to empower healthcare consumers with information and incentives to choose lower-cost providers may help mitigate the price effects of consolidation. To this end, employers

and health plans have increasingly offered enrollees access to cost transparency tools and benefit designs that include tiered copayments, reference-based pricing, and incentives to seek care at centers of excellence. Such 'steering' mechanisms have been shown to lower costs and put downward pressure on prices." Yet, those specific tools the study identified as important to maintaining competition are precisely the tools that OhioHealth suppressed through the vertical restraints it has forced on Network Vendors and payors.

51. In 2026, the White House Council of Economic Advisers issued a report titled "Effects of Banning Hospitals' Anti-Steering, Anti-Tiering, and All-or-Nothing Contracts." The report described restraints like those alleged here as "mechanisms by which dominant hospital systems insulate themselves from price competition" and estimated that banning such provisions would decrease prices by as much as 26 percent. The report specifically names OhioHealth as a hospital system that engages in this form of anticompetitive contracting.

52. OhioHealth's conduct also raises prices at its competitors. Because OhioHealth's provisions impede Network Vendors from offering competitors to OhioHealth higher patient volume in exchange for lower prices, those competitors have little incentive to lower prices. In a functioning market, competing providers would lower their prices to gain patient volume which would cause OhioHealth to keep its prices at competitive levels to avoid too much loss of volume. Instead, competitors have little incentive to offer discounts relative to OhioHealth because Network Vendors are inhibited from steering patients to those competitors in exchange for a discount. In economics literature, this concept is called "umbrella pricing" and Plaintiff and the proposed class have paid higher prices at non-OhioHealth providers in the Relevant Markets because of OhioHealth's conduct.

53. In addition, there is a growing recognition by lawmakers that anti-steering provisions are anticompetitive, as evidenced by recently enacted state statutes in Massachusetts, Connecticut, and Nevada (see Mass. Gen. Laws Ch. 176O, § 9A (Massachusetts); C.G.S.A. § 38a-477i (Connecticut); and N.R.S. § 598A.440 (Nevada)), as well as proposed federal legislation. *See* S. 2840, Bipartisan Primary Care and Health Workforce Act (Nov. 8, 2023).

## V. RELEVANT MARKETS

54. Judgment may be entered against OhioHealth for the illegal conduct described in this complaint without precisely defining the particular markets that OhioHealth's conduct has harmed or demonstrating OhioHealth's market power in those markets. OhioHealth's ability to persistently charge supracompetitive prices throughout the geographies where it operates is direct evidence of OhioHealth's market power that obviates the need to precisely define relevant markets and assess market power indirectly through the use of market shares. Likewise, OhioHealth's ability to impose anticompetitive restraints in nearly all of its negotiations and agreements with Network Vendors and payors—and to limit the ability of its competitor-hospitals to work with Network Vendors and payors to create tiered and narrow networks—is direct evidence of OhioHealth's market power that obviates the need to precisely define relevant markets and assess market power indirectly through the use of market shares.

55. Notwithstanding the foregoing, the markets that are relevant to the illegal conduct described in this Complaint are properly defined herein.

### A. Relevant Product Markets

#### i. Inpatient Services

56. A relevant product market in this action is the market for acute inpatient hospital services, sometimes referred to as general acute care ("GAC") services or just "inpatient services." This market for inpatient hospital services includes sales of such services to

individual, group, fully insured, and self-funded health plans. OhioHealth sells these services at each of its hospitals, although not every facility offers the exact same cluster of services.

57. Inpatient services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual inpatient services are not substitutes for each other (*e.g.*, orthopedic surgery is not a substitute for gastroenterology), Network Vendors typically contract for acute inpatient hospital services as a cluster in a single negotiation with a hospital, the services are sold under similar competitive conditions, and OhioHealth's contractual restrictions have an adverse impact on the sale of all inpatient services. Therefore, individual inpatient services can be analyzed together.

58. Moreover, non-hospital facilities, such as independent outpatient facilities, specialty facilities (*e.g.*, nursing homes), and facilities that provide long-term psychiatric care, substance abuse treatment, and rehabilitation services do not offer services that are viable substitutes for acute inpatient services. Health plans and consumers' demand for acute inpatient hospital services is generally inelastic because such services are often necessary to prevent death or long-term harm to health. Thus, inpatient services can be treated analytically as a single product market.

59. The market for acute inpatient hospital services has extremely high barriers to entry relative to other product markets. These barriers to entry include, but are not limited to, the need to spend significant money to build expensive facilities; the difficulty of hiring skilled staff (such as surgeons and anesthesiologists with specialized licenses to practice in the specific geography); extremely onerous regulatory hurdles for opening a new hospital, such as obtaining approval from state and local officials; the limited availability of real estate available to build new hospitals in many areas; and the many years required to build a new hospital.

60. The Relevant Product Market does not include sales of acute inpatient hospital services to government payers, *e.g.*, Medicare, Medicaid, and TRICARE (covering military families), because healthcare providers' negotiations with commercial Network Vendors and health plans are separate from the process used to determine the rates paid by government payers.

61. There are no reasonable substitutes or alternatives to inpatient services. Consequently, a hypothetical monopolist of inpatient services sold to payors would likely profitably impose a small but significant price increase or other worsening of terms for those services over a sustained period of time.

**ii. Outpatient Services**

62. A relevant product market in this action is the market for outpatient services. This market for outpatient services includes sales of such services to individual, group, fully insured, and self-funded health plans. OhioHealth sells these services at each of its facilities and through each of its physicians, although not every facility and physician offers the same cluster of services.

63. Outpatient services consist of a broad array of medical services provided outside of a hospital. Outpatient services vary from annual physicals to surgeries that can be conducted safely without an overnight stay in a hospital.

64. Unlike for acute inpatient hospital services, non-hospital facilities—such as independent primary care providers, specialty facilities, and ambulatory surgical centers—can be substitutes for outpatient medical services provided at a hospital. Consequently, health plans and consumers' demand for outpatient medical services *from a hospital* is generally more elastic because, if given the opportunity, they could obtain some of these services from non-hospital providers. But demand for outpatient medical services *in general* is inelastic because such

services are often necessary to prevent illness, loss of physical mobility, or long-term harm to health. Thus, outpatient medical services can be treated analytically as a single product market.

65. Although individual outpatient services are not substitutes for each other (*e.g.*, a CT scan is not a substitute for an annual physical), Network Vendors often contract for various individual outpatient medical services as a bundle in a single negotiation with a hospital system, and that is how OhioHealth negotiates with Network Vendors with respect to outpatient hospital services. Network Vendors cannot assemble a viable insurance network without the inclusion of enough specialty outpatient physicians in all specialties near where patients live.

66. These two product markets—inpatient services and outpatient services—are separate. Health plans often purchase outpatient medical services from different providers (*i.e.*, non-hospital providers) than those from which they purchase acute inpatient hospital services, which can only be purchased from hospitals. The existence of non-hospital competitors would, absent anticompetitive behavior, reduce the price health plans would pay a hospital system for outpatient medical services, but those competitors would not affect the price a hospital could charge for acute inpatient hospital services. There are also numerous procedures that can only be performed in an inpatient setting (*i.e.*, complex surgeries) instead of an outpatient setting and numerous procedures that are never performed in an inpatient setting (*i.e.,* annual physical and types of preventative screenings.) The markets are therefore distinct.

**B. Relevant Geographic Markets and Market Power**

67. Defining relevant geographic markets identifies the geographic area in which OhioHealth wields market power and the anticompetitive effect of OhioHealth's conduct.

68. **Central Ohio** is a relevant geographic market. Also known as the Columbus–Marion–Zanesville, OH Combined Statistical Area (as defined by the U.S. Census), Central Ohio comprises Delaware, Fairfield, Franklin, Hocking, Licking, Madison, Morrow,

Perry, Pickaway, Union, Athens, Fayette, Guernsey, Knox, Logan, Marion, Muskingum, and Ross counties. OhioHealth controls over 37% of discharges in Central Ohio. Major Network Vendors are not able to remain commercially viable without including at least some of OhioHealth in their insurance networks sold in Central Ohio because employers and patients would not use a network that lacked all OhioHealth providers.

69. In Central Ohio, OhioHealth's market power is evident in its ability to charge supracompetitive prices for the same services as its competitors. For inpatient services, OhioHealth's prices are about 20% higher than its primary competitor. For outpatient services, OhioHealth's prices are about 33% higher than its primary competitor. Despite supracompetitive prices in both product markets, OhioHealth has not been taken out of network by any major Network Vendor during the last five years and has not experienced a loss of patient volume in either product market.

70. The Columbus Metropolitan Statistical Area ("**Columbus MSA**") is a relevant geographic market. The Columbus MSA comprises Delaware, Fairfield, Franklin, Hocking, Licking, Madison, Morrow, Perry, Pickaway, and Union counties. OhioHealth controls 40-45% of inpatient discharges in the Columbus MSA.

71. In the Columbus MSA, OhioHealth's market power is evident in its ability to charge supracompetitive prices for the same services as its competitors. For inpatient services, OhioHealth's prices are about 20% higher than its primary competitor. For outpatient services, OhioHealth's prices are about 33% higher than its primary competitor. Despite vastly supracompetitive prices in both product markets, OhioHealth has not been taken out of network by any major Network Vendor during the last five years and has not experienced a loss of patient volume in either product market.

72. Within Central Ohio and the Columbus MSA, OhioHealth owns several hospitals that an insurance network must include to be commercially viable because most employers in the area would not purchase a network that excluded that OhioHealth facility. For example, most employers with employees in Morrow County would not select an insurance network that included no hospitals in the county because their employees would not accept a plan where they could not access their local community hospital. OhioHealth owns the only hospital in Morrow County. Similarly, OhioHealth owns the only general acute care hospital in Delaware County and the majority of employers with employees in Delaware County would not select an insurance network that excluded the only hospital in Delaware County because their employees would not accept such a network. Similarly, OhioHealth owns the only general acute care hospital in Pickaway County and the majority of employers with employees in Pickaway County would not select an insurance network that excluded the only hospital in Pickaway County because their employees would not accept such a network. The same applies for outpatient services where OhioHealth controls the majority or all outpatient providers in a number of key specialties in specific geographies. For example, in Delaware, Fairfield, Morrow, and Pickaway Counties Ohio Health controls the majority or, in some cases, all specialty providers in areas like cardiology, pulmonology, endocrinology, urology, or others. An insurance network that excluded OhioHealth outpatient providers would not be commercially viable in Central Ohio or the Columbus MSA if it contained numerous counties with less than half (or none) of the specialty providers in those geographies.

73. **Central Columbus** is a relevant geographic market that compromises Franklin and Delaware counties. OhioHealth controls over 48% of inpatient discharges in Central Columbus.

74. In Central Columbus, OhioHealth's market power is evident in its ability to charge supracompetitive prices for the same services as its competitors. For inpatient services, OhioHealth's prices are about 32% higher than its primary competitor. For outpatient services, OhioHealth's prices are about 6% higher than its primary competitor and it controls the largest share of key outpatient specialists including cardiology. Despite supracompetitive prices in both product markets, OhioHealth has not been taken out of network by any major Network Vendor during the last five years and has not experienced a loss of patient volume in either product market.

75. The Mansfield Metropolitan Statistical Area ("**Mansfield MSA**") is a relevant geographic market. OhioHealth controls over 64% of inpatient discharges from patients who live in the Mansfield MSA and owns what it calls the "area's only full-service hospital." The next two largest hospital systems control 11% and 6% of inpatient discharges in the Mansfield MSA. OhioHealth controls the majority of outpatient providers in a number of specialties in the Mansfield MSA including cardiology, neurology, endocrinology, and pulmonology.

76. In the Mansfield MSA, OhioHealth's market power is evident in its ability to charge supracompetitive prices for the same services as its competitors. For inpatient services, OhioHealth's prices are about 20% higher than one of its primary competitors. For outpatient services, OhioHealth's prices are about 33% higher than one of its primary competitors. Despite supracompetitive prices in both product markets, OhioHealth has not been taken out of network by any major Network Vendor during the last five years and has not experienced a loss of patient volume in either product market.

77. The Athens Micropolitan Statistical Area ("**Athens MSA**") is a relevant geographic market. OhioHealth controls over 71% of inpatient discharges from patients who live

in the Athens MSA and owns the only general acute care hospital located in Athens. The next largest hospital system controls 9% of inpatient discharges. OhioHealth's inpatient prices are about 11% higher than its next largest competitor and its outpatient prices are about 16% higher. OhioHealth controls the majority or all or the outpatient providers in a number of specialties including cardiology, endocrinology, neurology, and pulmonology.

78. The Cambridge Micropolitan Statistical Area ("**Cambridge MSA**") is a relevant geographic market. OhioHealth controls 46% of inpatient discharges from patients who live in the Cambridge MSA. OhioHealth controls the majority or all or the outpatient providers in a number of specialties including cardiology, neurology, and pulmonology. The next two largest hospital systems control 32% and 13% of inpatient discharges in the Cambridge MSA. OhioHealth's inpatient prices are about 20% higher than its next largest competitor and its outpatient prices are about 27% higher than its next largest competitor.

79. Patients generally seek inpatient care from hospitals in the areas where they live and work and where their local physicians have admitting privileges. As stated in an FTC study, "In healthcare markets, distance to medical provider is one of the most important predictors of provider choice." Courts have likewise recognized that "people want to be hospitalized near their families and homes, in hospitals in which their own – local – doctors have hospital privileges." Given this, patients do not typically regard hospitals or outpatient providers that require significant travel time as substitutes for local ones, particularly when they have little or no financial incentive to travel greater distances.[6] Consequently, an insurance network that does

[6] *See, e.g.*, Gautam Gowrisankaran, Aviv Nevo, and Robert Town, "Mergers When Prices are Negotiated: Evidence from the Hospital Industry," American Economic Review, Vol. 105, No. 1, January 2015, pp. 172–203, p. 191 ("Consistent with the large literature on hospital choice, we find that patients are very sensitive to travel times. […] An increase in travel time of five minutes reduces each hospital's share between 17 and 41 percent. The parameter estimates imply that increasing the travel time to all hospitals by one minute reduces consumer surplus by approximately $167."); Katherine Ho, "The Welfare Effects of Restricted Hospital Choice in the US Medical Care Market," Journal of Applied Econometrics, Vol. 21, No. 7, 2006, pp. 1039–1079, p. 1059 ("If a hospital moves an additional mile away from a patient's home, this reduces the probability that the

not satisfy patient demand for access to conveniently located hospitals and outpatient providers will not be commercially viable.

80. Network Vendors who seek to sell their networks to payors located in the relevant geographic markets or with employees in the relevant geographic markets must include acute inpatient hospital services from hospitals within the relevant geographic markets in their networks. This is because people who live and work in the relevant geographic markets strongly prefer to obtain acute inpatient hospital services within the relevant geographic markets, and it could be medically inappropriate and infeasible to require them to travel farther. Payors whose health plans have members in the relevant geographic markets have little or no willingness to select a Network Vendor whose network provides no in-network access to acute inpatient hospital services located in the relevant geographic markets.

81. Network Adequacy rules at the federal level also require that provider networks have a certain number of hospitals and outpatient providers within a specific distance of most plan members. These requirements make it much more difficult to entirely exclude a provider with a large number of facilities and a large number of employed physicians across specialties like OhioHealth.

82. Health plans covering members who live or work in the relevant geographic markets do not regard hospitals offering acute inpatient services outside of the relevant geographic markets as reasonable alternatives for hospitals offering acute inpatient services within the relevant geographic markets. Accordingly, Network Vendors seeking to build provider networks that would be attractive to those residents and their employers would not regard acute inpatient hospital services from hospitals outside of the relevant geographic markets

patient will choose it by 21%. Emergency admissions are even more sensitive to distance than non-emergencies.")

as reasonable alternatives for acute inpatient hospital services from hospitals within the relevant geographic markets.

## VI. ANTICOMPETITIVE CONDUCT

83. For at least the past decade, OhioHealth has required that a Network Vendor seeking to assemble a provider network in the Relevant Markets must include *all* OhioHealth facilities and providers if it wants to include *any* providers. This conduct eliminates competitive price pressure for OhioHealth: Because a provider network in the Relevant Markets needs to include at least some OhioHealth facilities and providers to be viable, the requirement to include all OhioHealth facilities eliminates pricing pressure that the threat of exclusion from a network would cause.

84. OhioHealth also has impeded Network Vendors from building provider networks that disfavor OhioHealth. OhioHealth has included provisions in its contracts with all major Network Vendors that impede the development of budget-conscious plans through selective contracting. This includes provisions that block, financially disincentivize, or otherwise obstruct steering, tiering, and narrow networks.

85. OhioHealth agreed to remove these provisions only after the U.S. Department of Justice ("DOJ") and the Ohio Attorney General ("Ohio AG") sued earlier this year, alleging the same antitrust violations alleged herein. In the subsequent settlement agreement, DOJ, the Ohio AG, and OhioHealth identified "[e]xamples of contract provisions that prohibit, deter, prevent or Penalize Steering, Steered Plans, or Transparency" including provisions that required a Network Vendor to pay financial offsets to OhioHealth for narrow networks that disfavored OhioHealth, allowed OhioHealth to terminate the entire Network Vendor contract in the case of any OhioHealth facility or provider being excluded from a budget-conscious plan, and barred

Network Vendors from "any strategy to directly or indirectly steer Covered Individuals to provider facilities other than those of any OhioHealth Provider" with limited exceptions.

86. The Wall Street Journal identified OhioHealth as one of the hospital systems around the country that use "secret restrictions" that "limit how insurers design plans" that have caused higher health care costs. However, OhioHealth maintained its restraints - and the secrecy around them - after this reporting.

87. OhioHealth continued to include these restraints through 2026 in its contract with all or nearly all Network Vendors in all the geographic markets outlined above even after other health systems have agreed to remove very similar restraints either because of litigation, government investigations, or press coverage. In 2018, a large hospital system in North Carolina agreed to remove similar provisions to those OhioHealth uses in a settlement with the U.S. Department of Justice and the North Carolina Attorney General. In 2019, a large hospital system in California agreed to remove similar provisions to OhioHealth's in a settlement with the California Attorney General and a class of health plans. Yet, OhioHealth continued to maintain similar provisions.

88. OhioHealth has worked to keep these restraints and the extent of these restraints hidden from Plaintiff and the proposed class. First, Network Vendors are barred by OhioHealth from disclosing the existence of the restraints to Plaintiff, other Network Vendors, and the proposed class. Second, OhioHealth has prevented the patients who are members of health plans in the class from accessing truthful information about OhioHealth's prices and also bars those members from knowing about the restraints that impact their prices. Even after the DOJ lawsuit, OhioHealth has sought to keep the specifics of its contractual restraints secret from Plaintiff, the public, the proposed class, and members of health plans in the class.

## VII. ANTICOMPETITIVE EFFECTS

### A. OhioHealth's Prices Drive Up Costs for Payors

89. Prices set by hospital systems like OhioHealth are the primary driver of cost for payors, including Plaintiff. OhioHealth's anticompetitive conduct allows it to set supracompetitive prices that Plaintiff and the proposed class must pay. Insurance companies and self-funded payors like Plaintiff have made millions of dollars in purchases for OhioHealth's services at the supracompetitive price levels that OhioHealth's unlawful conduct allowed it to charge.

90. A Harvard University analysis concluded that, "Variation in spending in the commercial insurance market is due mainly to differences in price markups by providers rather than to differences in the utilization of healthcare services. . . . 70 percent of variation in total commercial spending is attributable to price markups, most likely reflecting the varying market power of providers."

### B. OhioHealth Charges Supracompetitive Prices throughout the Relevant Geographic Markets.

91. OhioHealth's inpatient and outpatient prices relative to other providers result from OhioHealth's abuse of its market power to control prices in the relevant geographic markets. Without the vertical restraints that OhioHealth uses to leverage its market power, OhioHealth would not be able to maintain these supracompetitive prices. If Network Vendors and payors could use or threaten steering, network exclusion, or other selective contracting in their negotiations with OhioHealth, it would not be profitable or sustainable for OhioHealth to maintain its high prices. The Ohio Manufacturers Association (many of whose members are members of the proposed class) made clear that OhioHealth's restraints block price competition from happening in the first place: "When competition gets boxed out, employers get boxed into

higher prices. Manufacturers want transparency and real choice, not contracts that decide winners before the market ever speaks."

92. The above-described price differentials between OhioHealth and its competitors are especially telling because OhioHealth's anticompetitive contracting practices reduce incentives for competing hospitals to lower their own prices. In an unrestrained market, OhioHealth's competitors would be incentivized to lower their prices in exchange for Network Vendors steering toward them. Because OhioHealth's restraints prohibit steering away from OhioHealth, however, competing hospital systems and independent providers have had significantly less incentive to lower their own prices because doing so is less likely to deliver higher patient volume. This has resulted in payors, including Plaintiff, being harmed by the "umbrella effects" of OhioHealth's anticompetitive conduct—*i.e.*, paying more for services at non-OhioHealth hospitals and providers (including Trinity Health / Mount Carmel and The Ohio State Wexner Medical Center) than they would pay in the absence of OhioHealth's restraints.

**VIII. OhioHealth's Market Power**

93. OhioHealth has market power in the Relevant Product Markets in each of the relevant geographic markets. OhioHealth has the ability to persistently and profitably charge prices above those that would be charged in a competitive market. This is direct evidence of market power.

94. OhioHealth is, by far, the most expensive hospital system in Central Ohio. While OhioHealth charges substantially higher prices than its competitors across the board, an analysis of pricing data shows that it is also vastly overpriced for what the U.S. Health and Human Services Department classifies as "shoppable" procedures—*i.e.*, routine, non-urgent services that can be scheduled in advance. For example, in inpatient obstetrics, OhioHealth's prices in Central

Ohio are *73% higher* than its primary competitor for a natural birth and *87% higher* for a c-section. Similarly, for routine outpatient testing, OhioHealth's prices for a basic metabolic panel and a comprehensive metabolic panel are *275% higher* than their primary competitor in Central Ohio. In a competitive market, the price for shoppable procedures would not vary as substantially from provider to provider, and OhioHealth would not be able to persistently charge higher prices than competitors. OhioHealth's ability to persistently and profitably charge supracompetitive prices for these procedures, and across all procedures more broadly, is direct evidence of its market power.

95. OhioHealth hospitals are included in-network in over 90% of the about 50 significant employer-sponsored and individual commercial provider networks offered by the largest Network Vendors in Central Ohio. The fact that OhioHealth is virtually always in-network for these plans, despite its high prices, strongly indicates that OhioHealth possesses and exercises market power in the relevant markets. Because of OhioHealth's size, the many hospitals and other providers it controls, and its dominant market position in certain critical service lines like cardiology, a Network Vendor selling health insurance plans to individuals and employers in the relevant geographic markets must have OhioHealth as a participant in at least some of its provider networks to have successful health network products. Without OhioHealth, an insurance plan would not be attractive to the employers and residents who prefer a broad network plan that covers medical care from the full range of providers, and thus would not be attractive to many self-funded payors and fully-insured entities.

96. OhioHealth understands that Network Vendors must contract with OhioHealth to successfully sell health insurance in all the Relevant Markets and exerts this leverage in its negotiations with Network Vendors. OhioHealth's ability to impose these provisions on at least

85% of Network Vendors independently evidences OhioHealth's market power. Because Network Vendors must pay OhioHealth's overcharges in connection with their fully insured business, OhioHealth's anti-steering provisions are directly financially harmful to Network Vendors. But because of OhioHealth's market power, the Network Vendors must accede to OhioHealth's demands.

97. OhioHealth's market power is sustainable (and unlikely to be challenged by entrants) in part because of the enormous barriers to entry for any would-be competitor in the market for providing acute inpatient hospital services, which include financial, legal, and regulatory hurdles to obtaining approval for and building a hospital in Ohio; difficulty of attracting specialized staff in a tight labor market featuring non-compete agreements with physicians; and referral networks and medical records rules that disadvantage new entrants.

98. Specific regulatory requirements in Ohio include specific licensing processes and accreditation standards that are expensive and time consuming. A new hospital must complete a detailed licensing application process with the Ohio Department of Health. As of 2022, those requirements are much more stringent requiring more detailed applications, higher fees, and separate accreditation requirements that are costly and time consuming. The Ohio Department of Health can reject or delay applications, causing risk and uncertainty for potential entrants. Local zoning regulations also limit or constrain the ability to build new hospitals in the Relevant Markets and there is no certainty that a zoning application will be approved by municipalities. The building code requirements in Ohio are high for hospitals and require expensive compliance with extensive standards and the possibility of lengthy delays in construction. State and federal regulations, including those specific to medical waste, require expensive and site-specific costs for new hospitals in Ohio. Local county health departments have additional requirements for

hospitals in the Relevant Markets, including for food service at hospitals. All those requirements create financial and temporal barriers to entry far above most markets.

99. OhioHealth is incredibly politically powerful in the Relevant Markets, spending millions on lobbying, public relations, political donations through its PAC and executives, and similar influence activities. OhioHealth's ability to influence regulators or politicians would deter potential new entrants because of the higher risk their regulatory approvals may not be granted or unfavorable legislative or regulatory decisions would be issued.

100. Labor shortages specific to the healthcare sector in Ohio are another barrier to entry for competitors to OhioHealth. Currently 91% of healthcare facilities in Ohio are understaffed - a crisis that has drawn the attention of the Ohio legislature the past several years. A new entrant in the Relevant Markets would find it very difficult and time-consuming to affordably recruit enough nurses, physicians, and technical medical staff to open a facility in line with accreditation standards and necessary staffing ratios.

101. Technology that is required for a new hospital to be competitive is expensive and exclusive. For example, the dominant provider of electronic medical records only makes its platform available to approved hospitals—and even then at increasingly high prices to launch. A new entrant seeking to compete with OhioHealth would have no guarantee that it would have access to necessary health records technology—and even if it does, those launch costs present a high barrier to entry specific to the hospital market.

102. OhioHealth's ownership of an insurance company called OhioHealthy creates a barrier to entry for potential new hospital competitors. The OhioHealthy plan favors OhioHealth providers and financially encourages patients to seek care at OhioHealth facilities. For a potential entrant, that means that a meaningful percentage of patient flow is dependent on an entity owned

by the dominant existing market participant. This reduces the likely volume available to potential new entrants and the risks associated with opening new facilities in the Relevant Markets.

## IX. Class Allegations

### A. Class Definition

103. Plaintiff defines the proposed class in this litigation as follows:

> All entities that purchased inpatient or outpatient services from OhioHealth at any point during the relevant time period to the present (the "Class Period").

104. The "relevant time period" noted in the class definition will depend on various facts, including but not limited to OhioHealth's fraudulent concealment of the restraints at issue in this litigation and DOJ's prosecution of its related action against OhioHealth—but in no event would the relevant time period be less than four years from the date of the filing of this lawsuit.

105. Excluded from the class are (1) individuals or entities whose only payments to Defendant were co-pays, coinsurance, or any payments for out-of-network claims; (2) Defendant; (3) all federal governmental entities; (4) the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court(s); and (5) Plaintiff's counsel.

106. This class definition is subject to revision or amendment as the matter proceeds.

107. The class is ascertainable because it is defined to include only direct payers who paid at least one claim to OhioHealth during the class period.

### B. Certification Requirements

108. Plaintiff does not yet know the exact size of the class; however, based upon the nature of the industry involved, Plaintiff believes that there are thousands of class members. Therefore, class members are so numerous that joinder is ultimately impracticable.

109. Because OhioHealth has acted in a generally consistent manner applicable to the class writ large, questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class. The common questions include, but are not limited to:

a. The definition of the relevant product market and geographic market;

b. Whether OhioHealth has market power in the relevant markets;

c. Whether OhioHealth engaged in anticompetitive conduct by imposing contractual restrictions that unreasonably restrain trade;

d. Whether OhioHealth's vertical restraints enable it to charge unlawful supracompetitive prices;

e. Whether Plaintiff and the proposed class have suffered injury caused by the alleged anticompetitive conduct;

f. Whether OhioHealth's conduct violates the Sherman Act and/or Valentine Act; and

g. Whether and to what extent Plaintiff and the proposed class members are entitled to an award of compensatory damages and/or injunctive, declaratory, or equitable relief.

110. Plaintiff's claims are typical of the claims of the other class members. Plaintiff and the other class members have been injured by the same wrongful practices. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories. Because OhioHealth imposes similar anticompetitive restraints on all or nearly all Network Vendors, including Plaintiff's, Plaintiff's claims regarding the anticompetitive conduct and the harm it has caused Plaintiff are typical of those of the class.

111. Plaintiff will adequately represent the interest of all class members. Plaintiff has retained class counsel who are experienced and qualified in prosecuting antitrust and class action cases. Neither Plaintiff nor class counsel have any interests in conflict with those of the class members.

112. This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions that affect only individual members. Individual joinder of all members of the class is impracticable and class treatment will permit a large number of similarly situated payors to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) due to the complexity of issues involved in this action and the expense of litigating the claims, many class members could not afford to seek legal redress individually for the wrongs that defendants committed against them, and many absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when OhioHealth's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and OhioHealth's violations of law will continue without full redress while OhioHealth continues to reap and retain the substantial proceeds of their wrongful conduct; and

113. This action does not present any undue difficulties that would impede its management by the Court as a class action. Furthermore, the prosecution of the claims of the class in part for injunctive relief is appropriate because OhioHealth has acted, or refused to act,

on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## X. CLAIMS FOR RELIEF

### COUNT ONE
### RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1)

114. The above-alleged paragraphs are incorporated by reference.

115. Defendant OhioHealth entered into and continues to enter into anticompetitive contracts with Network Vendors and is engaging in unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

116. OhioHealth has imposed these vertical restraints in its negotiations with all or nearly all Network Vendors it negotiates with in Ohio using the market power it has in each of the Relevant Markets. These restraints, together and individually, have foreclosed a substantial amount of competition. Because OhioHealth imposes them on all or nearly all Network Vendors, these restraints have affected competition as a whole in the Relevant Markets.

117. By compelling Network Vendors to agree to these anticompetitive terms, OhioHealth unlawfully restrains trade and limits the ability of current and potential competitors to compete in the Relevant Markets. The anti-competitive effects of OhioHealth's conduct far outweigh any purported non-pretextual, pro-competitive justifications.

118. Thus, Plaintiff and members of the Class have been injured in their business or property during the last four years in violation of the Sherman Act, having been subjected to and paying supracompetitive pricing to OhioHealth for inpatient and outpatient services during the Class Period. Such overcharges are the type of injury that the antitrust laws were designed to prevent, and they are the direct result of Defendant's unlawful conduct. Plaintiff and members of the Class have standing to and do hereby seek monetary relief—including treble

damages—together with injunctive, declaratory and other equitable relief, as well as attorneys' fees and costs.

**COUNT TWO**
**RESTRAINT OF TRADE IN VIOLATION OF THE VALENTINE ACT**
**(Section 1331.01 *et seq.* of the Ohio Revised Code)**

119. The above-alleged paragraphs are incorporated by reference.

120. Defendant OhioHealth entered into and continues to enter into anticompetitive contracts with Network Vendors and is engaging in unreasonable restraints of trade in violation of the Valentine Act.

121. OhioHealth has imposed these vertical restraints in its negotiations with all or nearly all Network Vendors it negotiates with in Ohio using the market power it has in each of the Relevant Markets. These restraints, together and individually, have foreclosed a substantial amount of competition. Because OhioHealth imposes them on all or nearly all Network Vendors, these restraints have affected competition as a whole in the Relevant Markets.

122. By compelling Network Vendors to agree to these anticompetitive terms, OhioHealth unlawfully restrains trade and limits the ability of current and potential competitors to compete in the Relevant Markets. The anti-competitive effects of OhioHealth's conduct far outweigh any purported non-pretextual, pro-competitive justifications.

123. Thus, Plaintiff and members of the Class have been injured in their business or property during the last four years in violation of the Valentine Act, having been subjected to and paying supracompetitive pricing to OhioHealth for inpatient and outpatient services during the Class Period. Such overcharges are the type of injury that the antitrust laws were designed to prevent, and they are the direct result of Defendant's unlawful conduct. Plaintiff and members of the Class have standing to and do hereby seek monetary relief—including treble

damages—together with injunctive, declaratory and other equitable relief, as well as attorneys' fees and costs.

**COUNT THREE**
**MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 2)**

124. The above-alleged paragraphs are incorporated by reference.

125. Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." It is also unlawful to willfully maintain or abuse monopoly power.

126. OhioHealth has monopolized, and continues to monopolize, the Relevant Markets alleged herein in violation of 15 U.S.C. § 2. During the pertinent times, Defendant engaged in the willful and unlawful attempt to maintain and abuse its monopoly power. It did so by using its market power in those geographies to impose on Network Vendors the vertical restraints outlined above.

127. These restraints have also allowed OhioHealth to leverage its monopoly power in the Relevant Markets to extract supracompetitive prices everywhere it operates.

128. Plaintiff and members of the Class have been harmed by OhioHealth's abuse, willful maintenance, and leveraging of its monopoly power. They have paid higher prices at OhioHealth facilities in the Relevant Geographic Markets than they would have absent OhioHealth's unlawful monopolization, both directly due to the vertical restraints themselves and due to the substantial lessening of competition the restraints have facilitated.

129. Thus, Plaintiff and members of the Class have been injured in their business or property in the last four years in violation of the Sherman Act, having been subjected to and paying supracompetitive pricing to OhioHealth for acute general care hospital services and ancillary products during the Class Period. Such overcharges are the type of injury that the antitrust laws were explicitly designed to prevent, and they are a direct result of Defendant's unlawful conduct. Under 15 U.S.C. § 2, and 15 U.S.C. § 15 Plaintiff and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory and other equitable relief, as well as attorneys' fees and costs.

**COUNT FOUR**
**ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 2)**

130. The above-alleged paragraphs are incorporated by reference.

131. Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

132. During the pertinent times, OhioHealth engaged in the willful and unlawful attempt to maintain or expand its monopoly power. Specifically, OhioHealth attempted to monopolize the market for outpatient services in all the relevant geographic markets. There is a dangerous probability that OhioHealth will be successful in its attempt to monopolize those markets.

133. During the pertinent times, OhioHealth attempted to acquire or expand its monopoly through illegitimate means through its use of the vertical restraints outlined above.

134. Plaintiff and members of the Class have been injured during the last four years by OhioHealth's use of these vertical restraints, and would be further injured if OhioHealth is successful in monopolizing those markets.

135. Under 15 U.S.C. § 2 and 15 U.S.C. § 15, Plaintiff and the members of the Class have standing to and do hereby seek monetary relief—including treble damages—together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**COUNT FIVE**
**UNJUST ENRICHMENT**

136. The above-alleged paragraphs are incorporated by reference.

137. Alternatively, from OhioHealth's unfair acts as alleged above, OhioHealth has been unjustly enriched at the expense of Plaintiff and members of the proposed class.

138. OhioHealth has been unjustly enriched by retaining artificially high payments for services purchased by Plaintiff and members of the proposed class.

139. OhioHealth has been enriched at the expense of Plaintiff and members of the proposed class.

140. The retention of these payments by OhioHealth violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the proposed class.

## XI. JURY DEMAND

141. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demand a trial by jury as to all issues so triable.

## XII. PRAYER FOR RELIEF

142. WHEREFORE, Plaintiff, on their own behalf and on behalf of the proposed class, respectfully request that this Court enter judgment on their behalf, and on behalf of those similarly situated, and adjudge and decree as follows:

a. Certify the proposed class, direct that reasonable notice be given to the class, designate the named Plaintiff as class representatives, and allow Plaintiff and the Class to have trial by jury;

b. Find that Defendant has unreasonably restrained trade in violation of the Sherman Act and the Valentine Act and that Plaintiff and the class members have been damaged and injured in their business and property as a result of these violations;

c. Find that Defendant has monopolized, and continues to monopolize, the relevant markets alleged herein in violation of 15 U.S.C. § 2 and that Plaintiff and the Class members have been damaged and injured in their business and property as a result of these violations;

d. Order that Plaintiff and members of the class recover the damages determined to have been sustained by them as a result of the Defendant's misconduct complained of herein, in an amount to be trebled in accordance with such laws, and that judgment be entered against Defendant for the amount so determined;

e. Enter judgment against Defendant and in favor of Plaintiff and the class awarding restitution and disgorgement of ill-gotten gains to the extent such an equitable remedy be allowed by law;

f. Award reasonable attorneys' fees, costs, expenses, prejudgment and post-judgment interest, to the extent allowable by law;

g. Award equitable, injunctive, and declaratory relief, including but not limited to declaring Defendant's misconduct unlawful and enjoining it, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, agreeing to, or enforcing any provision in any agreement that prohibits or restricts competition in the manner as alleged herein above; and

h. Award such other and further relief as the Court may deem just and proper.

Respectfully submitted this 19th of August 2026.

Jamie Crooks (*pro hac vice* forthcoming)
Michael Lieberman (*pro hac vice* forthcoming)
**FAIRMARK PARTNERS, LLP**
400 7th Street, NW, Suite 304
Washington, DC 20004

(619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Frank R. Schirripa (*pro hac vice* forthcoming)
Gwendolyn Nelson (*pro hac vice* forthcoming)
**HACH ROSE SCHIRRIPA & REHNS LLP**
112 Madison Avenue, 10th Floor
New York, NY 10016
(212) 213-8311
fschirripa@hrsrlaw.com
gnelsonn@hrsrlaw.com

*/s/ Daniel O'Connor*
John Haseley (Ohio Bar # 0063042)
Daniel O'Connor (Ohio Bar # 0091397)
**O'CONNOR, HASELEY AND WILHELM LLC**
470 W. Broad St., Suite 15
Columbus, OH 43215
(614) 572-6762
haseley@goconnorlaw.com
doconnor@goconnorlaw.com

*Counsel for Plaintiff Cleveland Bakers and Teamsters Health and Welfare Fund and the Proposed Class*